# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Apr 26 2016, 9:10 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Larry Crawford Thomas
Clinton, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Monika Prekopa Talbot
Deputy Attorney General
Indianapolis, Indiana

## IN THE
## COURT OF APPEALS OF INDIANA

Deryk Hutton,
*Appellant-Defendant,*

v.

State of Indiana,
*Appellee-Plaintiff.*

April 26, 2016

Court of Appeals Case No.
61A05-1504-CR-162

Appeal from the Parke Circuit Court

The Honorable Sam A. Swaim, Judge

Trial Court Cause No.
61C01-1307-FA-168

**May, Judge.**

[1] Deryk Hutton appeals his convictions of Class A felony attempted child molesting,[1] Class A felony child molesting,[2] Class B felony child molesting,[3] and two counts of Class B felony sexual misconduct with a minor.[4] He raises three issues on review, which we consolidate and restate as:

> 1. Whether the trial court abused its discretion when it admitted the results of his polygraph examination; and

> 2. Whether the State presented sufficient evidence he committed the crimes.

[2] We affirm.

## Facts and Procedural History

[3] Hutton and the victim, B.H., are adopted siblings.[5] Hutton is nine years older than B.H. When B.H. was in sixth grade and twelve years old, she and Hutton were in a pole barn together and played "strip pool." (Tr. at 93.) Sometime during that incident, Hutton and B.H. went into a nearby wooded area and Hutton tried to "force himself" on B.H., but "the actual insertion didn't happen." (*Id.* at 94.)

---

[1] See Ind. Code §§ 35-42-4-3(a)(1) (2007); 35-41-5-1 (1977).

[2] Ind. Code § 35-42-4-3(a)(1) (2007).

[3] Ind. Code § 35-42-4-3(a) (2007).

[4] Ind. Code § 35-42-4-9(a)(1) (2007).

[5] B.H.'s father, Glen Hutton, married Deryk Hutton's mother, Lori Hutton. Lori adopted B.H. and Glen adopted Deryk. (Tr. at 91-92, 128, 207-208.)

[4] When B.H. was between sixth and seventh grade, Hutton took B.H. to the pole barn and "tried to do things there." (*Id*. at 96.) Hutton was interrupted when a child entered the pole barn. Hutton then took B.H. into the bathroom in the house, locked the door, and forced B.H. to engage in sexual intercourse. Sometime in 2009, when B.H. was in seventh grade, Hutton asked B.H. to enter his bedroom. Hutton and B.H. watched a pornographic video and Hutton forced B.H. to perform oral sex on him.

[5] B.H. testified that when she was in seventh grade, while at school, she told three of her friends "[her] brother had done some things to [her.]" (*Id*. at 99.) After school, B.H. was instructed to go to the police station or the jail to provide a report on the incidents.[6] B.H. talked to a sheriff's deputy, but was afraid her mother would be angry with her if she reported the incidents. She told the deputy nothing happened.

[6] In 2011, during the spring of B.H.'s eighth grade year, Hutton forced B.H. to submit to sexual intercourse in his apartment bedroom.[7] That summer, B.H. told her mother about the incidents with Hutton and B.H. testified that her mother confronted Hutton. (*Id*. at 102.) B.H. testified Hutton "said he was

---

[6] It is unclear from the record who reported to the Department of Child Services B.H.'s conversation with her friends and who instructed B.H. to go the police station or jail to report the incidents.

[7] Hutton, his wife, and their children moved out of the house where B.H. lived and into their own apartment in September, 2010. (Tr. at 245.) At some point, Hutton and his wife separated and Hutton filed for divorce on June 10, 2011. (*Id*. at 263.) Hutton's wife moved from the apartment "a couple weeks" before Hutton filed for a divorce. (*Id*. at 262-63.)

sorry, that he screwed up." (*Id.*) B.H. further testified that her mother asked B.H. if she wanted Hutton to lose everything, and B.H. indicated she did not, so B.H.'s mother told B.H. and Hutton they would keep the matter secret. (*Id.* at 103.)

[7] In 2012, when B.H. was in tenth grade and fifteen years old, B.H.'s mother would drop B.H. off at Hutton's house in the morning so B.H. could sleep an extra hour before walking to her school, which was near Hutton's house.[8] One day, B.H. returned to Hutton's house after school to take a shower between volleyball practice and the homecoming game. Hutton attempted to enter the shower with B.H. and get her "to do things" and "do things to [her]." (*Id.* at 123.) After the shower, Hutton performed oral sex on B.H. He took pictures of B.H. with his cell phone, but the pictures were deleted. B.H. testified Hutton told her he was sorry. (*Id.* at 125.)

[8] In 2013, B.H. visited her sister in Indianapolis. B.H. told her sister about the sexual incidents with Hutton, but asked her sister not to tell anyone. B.H.'s sister reported the incidents to Child Protective Services (CPS) and CPS initiated an investigation. Chief Deputy Jason Frazier, with the Parke County Sheriff's Office, was the investigating officer for the case. He was present when B.H. recounted the incidents to a forensic child examiner from Susie's Place, a child-advocacy center that investigates allegations of crimes against children.

---

[8] Hutton had moved from the apartment to a house. (*See* Tr. at 103; *see also* App. at 163.)

[9]     At some point during the investigation, Chief Deputy Frazier contacted Hutton and asked him if he would be willing to take a polygraph examination. On July 2, 2013, Charles L. Bollinger, who worked for the Parke County Prosecutor's Office at the time, met with Hutton at the Rockville Police Department. Bollinger provided Hutton with a "polygraph stipulation and agreement," (Tr. at 158), which Hutton signed. Bollinger administered the polygraph test and asked Hutton questions about the incidents involving B.H., specifically: "Has your penis ever touched your stepsister [B.H.'s] vagina?" and "Are you lying when you say your penis has never touched your stepsister [B.H.'s] vagina?" (*Id.* at 163.) The polygraph results indicated Hutton answered deceptively when he answered "no" to both questions.

[10]    On July 12, 2013, the State charged Hutton with two counts of Class A felony child molesting, one count of Class B felony child molesting, and two counts of Class B felony sexual misconduct with a minor. On June 10, 2014, Hutton filed a motion to suppress the results of the polygraph test. The trial court held a hearing and denied Hutton's motion on July 2, 2014. Hutton moved to certify the order for interlocutory appeal, and the trial court denied the motion on August 8, 2014. A jury found Hutton not guilty of Count I Class A felony child molesting, but found him guilty of the lesser included offense of Class A felony attempted child molesting.[9] Hutton also was found guilty of the other charges.

---

[9] Before the case went to the jury, the prosecution, defense counsel, and the court discussed the court's proposed final jury instruction that included language indicating the jury could consider whether Hutton

# Discussion and Decision

## *Admission of Polygraph Evidence*

[11]  Hutton's argument on admission of polygraph evidence is two-fold.  He argues the polygraph evidence is inadmissible because:  1) the stipulation agreement that he signed prior to taking the examination was ambiguous, speculative, and vague and, therefore, not a valid contract; and 2) he was not advised of his Sixth Amendment right to counsel.

[12]  Hutton objected to the admission of the polygraph evidence in a pre-trial motion to suppress and renewed his objection at trial.[10]  Because Hutton appeals following his conviction and is not appealing the trial court's order denying his motion to suppress, the question before us is properly framed as whether the trial court erred in admitting the polygraph evidence.  *Shell v. State*, 927 N.E.2d 413, 418 (Ind. Ct. App. 2010).  Admission of evidence at trial is left to the discretion of the trial court.  *Clark v. State*, 994 N.E.2d 252, 259-60 (Ind. 2013).  We review its determinations for abuse of that discretion and reverse

---

committed attempted child molesting if the State failed to prove he committed child molesting as alleged in Count I. (Tr. at 293-95.)  The instruction was submitted to the jury over defense counsel's objection.  Hutton does not challenge that instruction on appeal.

[10] In its brief, the State asserts Hutton's challenge to the admission of the polygraph evidence is waived because Hutton did not object to the evidence at trial. (Appellee's Br. at 20.)  He did.  Hutton's counsel stated to the prosecutor and the judge, "And Judge, we pretty much agreed on instead of going through the entire Motion to Suppress before the Court that we would submit the transcript of the evidence from the suppression hearing as evidence . . . ." (Tr. at 148.)  The prosecutor stated, "Yes, they are renewing their objection for the record, Judge.  We stand on the argument the State's already [sic] – motion to suppress hearing and the Court's ruling." (*Id*.)  Thereafter, a detailed record of defense counsel's objection to the polygraph evidence was made, at the conclusion of which, the trial court "overruled [defense counsel's] objection to the polygraph as per our previous court order." (*Id*. at 152.)

only when admission is clearly against the logic and effect of the facts and circumstances and the error affects a party's substantial rights. *Id*. at 260. We will not reweigh evidence and we consider conflicting evidence most favorable to the trial court's ruling. *Marcum v. State*, 843 N.E.2d 546, 547 (Ind. Ct. App. 2006). We will also consider uncontested evidence favorable to the defendant. *Id*. The record must disclose substantial evidence of probative value that supports the trial court's decision. *Gonser v. State*, 843 N.E.2d 947, 949 (Ind. Ct. App. 2006). The trial court's ruling will be upheld if it is sustainable on any legal theory supported by the record, even if the trial court did not use that theory. *Id*.

[13] We have expressed reservations about the reliability of polygraph results. *McVey v. State*, 863 N.E.2d 434, 440 (Ind. Ct. App. 2007), *reh'g denied*. As a general rule the results of a polygraph examination are not competent evidence and are inadmissible at trial. *Owens v. State*, 176 Ind.App. 1, 3, 373 N.E.2d 913, 914 (1978). But where all the parties by stipulation have waived any objection, the court may allow the results to be admitted. *Id*. at 3, 373 N.E.2d at 914-15.

*Validity of Polygraph Stipulation*

[14] Hutton argues the polygraph stipulation and agreement he signed "contain[ed] misrepresentations of the law and fact, [was] ambiguous, and [was] speculative and vague." (Appellant's Br. at 20.) He maintains he could not knowingly, voluntarily, and intelligently enter into the stipulation because he did not request the examination; he did not know whether the polygraph examiner

qualified as an expert; and the language of the stipulation was too vague to inform him what testimony might be offered in court against him.

[15] As our Supreme Court observed in *Sanchez v. State*, 675 N.E.2d 306, 308 (Ind. 1996), there are four prerequisites to the admission of polygraph results: (1) the prosecutor, defendant, and defense counsel must all sign a written stipulation providing for the defendant's submission to the examination and for the subsequent admission at trial of the results; (2) the admissibility of the test results must be within the trial court's discretion as it relates to the examiner's qualifications and the test conditions; (3) the opposing party must have the right to cross-examine the polygraph examiner if his graphs and opinion are offered in evidence; and (4) the jury must be instructed that, at most, the examiner's testimony tends only to show whether the defendant was being truthful at the time of the examination, and that it is for the jury to determine the weight and effect to be given such testimony.

[16] A stipulation entered into by a defendant and the State before a polygraph examination is a contract. *Willey v. State*, 712 N.E.2d 434, 440 (Ind. 1999). Contract law principles control the use and interpretation of such stipulations. *Id*. In order for polygraph evidence to be admissible, it must be agreed to in unambiguous terms and the stipulation agreement, like any other contract, must not be the product of misrepresentation or mistake of fact. *Id*. at 441.

[17] Hutton stipulated as follows:

1.     Said Deryk S. Hutton understands that he or she is not under arrest nor in the custody of law enforcement in any way. He/she further understands that he/she has the right to remain silent and that anything he/she says can be used against them [sic] in a court of law. He/she further understands that he/she has the right to have an attorney present during questioning and that if they [sic] cannot afford an attorney, one will be appointed for them [sic]. Further, he/she acknowledges that no promises or threats have been made, and that no pressure or coercion of any kind has been used.

2.     Said Deryk S. Hutton, in person, has requested that he/she be given a polygraph examination by Charles L. Bollinger.

3.     That the Prosecuting Attorney for the 68th Judicial Circuit consents to the said Deryk S. Hutton[] taking the polygraph examination.

4.     That Charles L. Bollinger, is a qualified polygraph examiner and is qualified by his education, training and experience to testify as an expert witness in interpreting the results of the polygraph examination performed by him and the use of the polygraph as means of detection of deception.

5.     That the questions of the examiner, the answers by the said Deryk S. Hutton, and the record of his reactions to said questions, and interrogation or other things relating to said examination including the results and the opinions of the examiner relating to said examination be admitted as evidence, on behalf of the State of Indiana.

6.     That Deryk S. Hutton[] hereby waives his/her constitutional privilege against self-incrimination to the extent

that the same may be involved in the presentation of evidence in the foregoing matters.

> 7.      That the results from the polygraph examination may be used either by Deryk S. Hutton, [sic] or the State of Indiana in future trials or criminal proceedings.

(State's Ex. 2.)

### 1.      Request for Polygraph Examination

Hutton contends he did not request the polygraph examination, and the stipulation was not a binding contract because it said he did.  We disagree.

A police officer contacted Hutton about taking a polygraph examination. Hutton agreed and voluntarily met with the polygraph examiner.  Before the examination, the stipulation was read to Hutton by the examiner as Hutton followed along.  Hutton indicated that he understood the terms of the stipulation and he signed it.  Hutton could have indicated that the stipulation was incorrect, requested the stipulation language be changed, or not signed the stipulation.  He chose to sign the stipulation as written.  *See, e.g.*, *Pinnacle Computer Servs., Inc. v. Ameritech Publ'g, Inc.,* 642 N.E.2d 1011, 1017 (Ind. Ct. App. 1994) (court cannot relieve party from terms of contract because of party's failure to read all or part of it, as party is bound to know the contents of the contract it signs), *reh'g denied*; *see also*, *Buschman v. ADS Corp.,* 782 N.E.2d 423, 428 (Ind. Ct. App. 2003) (citing *Lake Cnty. Trust Co. v. Wine,* 704 N.E.2d 1035, 1040 (Ind. Ct. App. 1998)) (a person is presumed to understand and assent to

the terms of the contract he signs).  We cannot find error on the ground the stipulation was not a binding contract.

### 2.     *Polygraph Examiner's Qualifications*

[20]     Hutton next takes issue with paragraph 4 of the stipulation, which indicates the polygraph examiner is qualified to testify as an expert witness and interpret the examination results.  Hutton argues he had "no knowledge of [the examiner's] qualifications or lack thereof as a polygraph examiner and could not intelligently, voluntarily and knowingly agree to something he had no knowledge of."  (Appellant's Br. at 20.)  As noted above, Hutton stipulated the examiner was qualified.  He did not challenge the examiner's qualifications.

[21]     Hutton asserts the language in paragraph 4 "is an attempt to take the determination as to whether someone is an expert out of the hands of the trial judge which is solely the trial court's determination."  (*Id*.)  Hutton's assertion fails.  The trial court heard testimony about the polygraph examiner's qualifications.  The examiner testified about his qualifications and how many polygraph examinations he has administered.  A video recording was entered into evidence showing the stipulation being read to Hutton and the pre-examination interview that followed.  The trial court determined the polygraph evidence was admissible.  There was sufficient evidence to determine the examiner's qualifications and the admissibility of the polygraph evidence.  *See Davidson v. State*, 558 N.E.2d 1077, 1086 (Ind. 1990) (finding that polygraph examiner's testimony at suppression hearing regarding his training, experience,

and the conditions of the examination was sufficient to find polygraph results admissible at trial). We find no error here.

### 3. *Vagueness of Stipulation*

[22] Hutton next directs us to paragraph 5 of the stipulation, which allows for the admissibility of the polygraph results: "the questions of the examiner, the answers by [Hutton], and the record of his reactions to said questions, and interrogation or *other things* relating to said examination including the results and the opinions of the examiner relating to said examination be admitted as evidence . . . ." (State's Exhibit 2) (emphasis added). Hutton maintains the "other things" language of the stipulation was too vague to allow him to determine what testimony might be offered in court against him. We cannot agree.

[23] Hutton attempts to compare the language found in paragraph 5 of his stipulation to the language of the stipulation in *Willey*. The *Willey* stipulation provided: "the questions of the examiner, the answers by the individual [and] any interrogation or *other things* relating to said examination, may be admitted as evidence. . . ." 712 N.E.2d at 440 (emphasis added). Our Supreme Court found that language "plainly and unambiguously" allowed the examiner's relevant questions and Willey's answers to be admitted into evidence, but was ambiguous as to the admission of the examiner's *opinion* as to Willey's

truthfulness.[11]  *Id*. (emphasis added).  The Court determined Willey's polygraph results were erroneously admitted at trial but the admission was harmless.  *Id*. at 442.  In reaching its decision, the Court provided examples of stipulations that

> unambiguously provide for the admission of a polygraph examiner's opinion testimony regarding the defendant's truthfulness in answering questions.  *See*, *e.g.*, *Willis v. State*, 268 Ind. 269, 273, 374 N.E.2d 520, 523 (1978) (stipulation provided 'any interrogation or other things related to said examination including the results and the opinions of the examiner relating to said examination, be admitted as evidence . . . .').

*Id*. at 441 (second citation omitted).

[24]   Hutton's stipulation, unlike Willey's, explicitly provided for the admission of his polygraph results and the opinions of the examiner and stated "the results from the polygraph examination may be used either by [Hutton] or the [State] in future trials or criminal proceedings."  (*See* State's Ex. 2, paragraph 7.)  Hutton's stipulation was not vague or ambiguous as to the admission of the

---

[11] Our Supreme Court specifically found:  (1) "in the context of a polygraph stipulation entered into without the assistance of counsel, 'other things' is too vague to alert a reasonable defendant that the [examiner would] be permitted to give an opinion that the defendant was deceptive or a liar," *Willey*, 712 N.E.2d at 440; (2) the stipulation did not "spell out" that the examiner's testimony might be offered in court against Willey, or that "'interpreting the results'" might include an opinion as to Willey's truthfulness, *id*. at 441; (3) another paragraph of the stipulation excluded from introduction into evidence items commonly referred to as the results, such as the polygraph charts and the examiner's notes and worksheets, *id*.; and (4) Willey submitted to the polygraph examination after being falsely informed that someone had implicated him in the crime.  *Id*.

examiner's opinion on Hutton's truthfulness or which results would be admissible at trial.

*Right to Counsel*

Hutton argues the trial court abused its discretion when it admitted the results of his polygraph test because the polygraph was administered without the presence of counsel. According to Hutton, his right to have counsel at the examination is guaranteed under the Sixth Amendment of the United States Constitution and under Article I, Section 13 of the Indiana Constitution because the polygraph examination was a critical stage of the criminal proceedings against him. Assuming, *arguendo*, a right to counsel attached, Hutton waived it.

In *Caraway v. State*, 891 N.E.2d 122, 127 (Ind. Ct. App. 2008), *reh'g denied*, we determined Caraway's right to counsel attached immediately before a detective asked him to sign the stipulation agreement. "Caraway had to stand alone against the State, and make a decision that may damage his defense at trial. At that critical stage, the absence of Caraway's right to an attorney derogated his right to a fair trial." *Id*. As Caraway was not "informed of his right to counsel prior to stipulating the results of a polygraph examination, he could not have waived it." *Id*. Hutton, by contrast, was informed of his right to counsel and he waived it. Caraway's stipulation did not include a *Miranda* warning or notice of Caraway's right to counsel. *Id*. Hutton's did.

The first paragraph of Hutton's stipulation included *Miranda* warnings and an advisement of his right to counsel. Before administering the polygraph examination, the examiner read to Hutton the stipulation and the waiver of rights. Hutton indicated that he understood the rights and the stipulation. By signing the stipulation, Hutton waived his right to counsel. We cannot say the trial court erred in admitting into evidence the results of Hutton's polygraph examination. *See Casada v. State*, 544 N.E.2d 189, 199 (Ind. Ct. App. 1989) (Polygraph examiner properly advised Casada of his *Miranda* rights, so Casada's "full awareness, before he took the examination, of his right to counsel and his failure to exercise that right constituted a clear waiver of it."), *trans. denied*.

### Sufficiency of Evidence

Hutton maintains there was insufficient evidence to support his convictions. When reviewing sufficiency of evidence to support a conviction, we consider only the probative evidence and reasonable inferences supporting the trial court's decision. *Drane v. State*, 867 N.E.2d 144, 146 (Ind. 2007). It is the fact-finder's role, and not ours, to assess witness credibility and weigh the evidence to determine whether it is sufficient to support a conviction. *Id*. To preserve this structure, when we are confronted with conflicting evidence, we consider it most favorably to the trial court's ruling. *Id*. We affirm a conviction unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt. *Id*. It is therefore not necessary that the evidence overcome every reasonable hypothesis of innocence; rather, the evidence is sufficient if an

inference reasonably may be drawn from it to support the trial court's decision. *Id*. at 147.

[29] Hutton invokes the "incredible dubiosity rule" under which we may impinge on the jury's responsibility to judge the credibility of the witness only when it has confronted "'inherently improbable' testimony [] or coerced, equivocal, wholly uncorroborated testimony of 'incredible dubiosity.'" *Rodgers v. State*, 422 N.E.2d 1211, 1213 (Ind. 1981) (citations omitted). We may reverse a conviction if the sole witness presents inherently improbable testimony and there is no circumstantial evidence of the defendant's guilt. *White v. State*, 706 N.E.2d 1078, 1079 (Ind. 1999). Application of this rule is rare and the standard to be applied is whether the testimony is so incredibly dubious or inherently improbable that no reasonable person could believe it. *Stephenson v. State*, 742 N.E.2d 463, 498 (Ind. 2001) (citations omitted).

[30] Hutton maintains B.H., the sole witness, presented inconsistent testimony at trial. Specifically, Hutton argues: (1) B.H. reported to friends that Hutton "had done some things to [her]," (Tr. at 99), but later recanted the allegations; (2) the polygraph examiner's opinion that Hutton's results showed deception was "highly suspect" because B.H. recanted the allegations against Hutton, (Appellant's Br. at 16); (3) there were inconsistencies in B.H.'s testimony regarding how much clothing she wore after the game of "strip pool" and whether Hutton engaged her in sexual intercourse after the game ended; (4) B.H. did not testify clearly to when Hutton first engaged in sexual intercourse with her; (5) her testimony regarding being forced to perform oral sex on

Hutton was "highly questionable," (*id.* at 14); (6) testimony from other individuals contradicted B.H.'s testimony; (7) regarding B.H. taking a shower at Hutton's house, "no reasonable person would have placed themselves [sic] in her position" and "any reasonable person would have taken a shower at school," (*id.* at 15); and (8) there was no circumstantial evidence to support the convictions.

[31]  B.H.'s testimony was not incredibly dubious. A conviction of child molesting may rest on the uncorroborated testimony of the victim. *Barger v. State*, 587 N.E.2d 1304, 1308 (Ind. 1992), *reh'g denied*. "The fact that a witness gives trial testimony that contradicts earlier pre-trial statements does not necessarily render the trial testimony incredibly dubious." *Murray v. State*, 761 N.E.2d 406, 409 (Ind. 2002). As for testimony from other individuals contradicting B.H.'s testimony, inconsistencies between the testimony of multiple witnesses do not make the evidence "incredible" as a matter of law. *Stephenson*, 742 N.E.2d at 497. Any inconsistencies in the testimony of multiple witnesses goes to the weight and credibility of the witnesses' testimony. *Id.* "It is for the trier of fact to resolve conflicts in the evidence and to decide which witnesses to believe or disbelieve. . . . If the testimony believed by the trier of fact is enough to support the verdict, then the reviewing court will not disturb it." *Ferrell v. State*, 746 N.E.2d 48, 51 (Ind. 2001) (citation omitted).

[32]  B.H. testified in detail regarding multiple incidents during which Hutton forced her to engage in sexual intercourse with him or forced her to perform or submit to oral sex. Hutton has not indicated, nor do we observe, any of B.H.'s

testimony that is inherently improbable, contradictory, or equivocal. Hutton's arguments are an invitation to reweigh the evidence and judge the credibility of the witness, which we cannot do. *See Drane*, 867 N.E.2d at 146. The jury believed B.H.'s testimony. Hutton has not shown her testimony was so inherently improbable that no reasonable trier of fact could believe it, and there is probative evidence from which the jury could have found Hutton guilty beyond a reasonable doubt. We affirm his convictions.

## Conclusion

[33]     The trial court did not abuse its discretion when it admitted the results of Hutton's polygraph examination, and the State presented sufficient evidence he committed the offenses of which a jury found him guilty. Accordingly, we affirm.

[34]     Affirmed.

Najam, J., and Riley, J., concur.